## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALLIANCE OF AUTOMOBILE | : | |
| MANUFACTURERS, INC., | : | |
|     Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:13-CV-398 (JCH) |
|     v. | : | |
| | : | |
| MELODY A. CURREY, COMMISSIONER, | : | NOVEMBER 26, 2013 |
| DEPARTMENT OF MOTOR VEHICLES | : | |
| OF THE STATE OF CONNECTICUT, | : | |
|     Defendant, | : | |
| | : | |
|     and | : | |
| | : | |
| CONNECTICUT AUTOMOTIVE | : | |
| RETAILERS ASSOCIATION, | : | |
|     Intervenor. | : | |

### RULING RE: DEFENDANTS' MOTION TO DISMISS (Doc. No. 32)

**I.      INTRODUCTION**

Plaintiff Alliance of Automobile Manufacturers, Inc. ("Alliance") brings this declaratory judgment action against defendant Melody Currey, Commissioner of the Connecticut Department of Motor Vehicles (the "Commissioner"), seeking to invalidate provisions of the Connecticut Franchise Act ("CFA"), as amended in 2009.  The Commissioner moves to dismiss Alliance's Complaint for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). Intervenor Connecticut Automotive Retailers Association ("CARA"), whose Motion to Intervene (Doc. No. 44) was granted on September 9, 2013, has filed additional briefing in support of the Commissioner.

On October 30, 2013, the court held an oral argument on the Commissioner's Motion to Dismiss (Doc. No. 32).  For the reasons below, the Motion is **GRANTED**.

1

## II.      BACKGROUND

Alliance is a non-profit trade association comprising twelve major automobile manufacturers ("Members"), none of which have their principal place of business in Connecticut or in-state manufacturing facilities.  Compl. (Doc. No. 1) ¶¶ 9, 14.  CARA is a trade association whose members, hundreds of automobile dealers in Connecticut, are required to perform warranty work pursuant to written agreements with the manufacturers.  See Fleming Aff. (Doc. No. 44-2) ¶¶ 3, 5.  The Commissioner is responsible for interpreting and enforcing the provisions of state law at issue in this case.  Compl. ¶ 11.

### A.      1982 Regulatory Scheme

Like many states, Connecticut regulates the relationship between manufacturers and dealers—in particular, the issue of warranty repair reimbursement—and has done so for decades, because of the perceived asymmetry in bargaining power.  See Compl. ¶¶ 45, 50.  As enacted in 1982, the state's regulatory scheme permits manufacturers to require dealers to perform certain warranty repair services, even on vehicles they did not sell.  See Pub. Act 82-445, § 2(a).  Under the 1982 law, as well as under current law, manufacturers' compensation to dealers performing warranty repairs must be reasonable, and time allowances for diagnosing and performing such repairs must be "reasonable and adequate for the work to be performed."  Id. § 2(b).

From 1982 to 2009, these repairs were to be reimbursed according to a schedule of compensation provided by the manufacturer.  Id.  The dealer's minimum hourly rate for labor on warranty work was set at the rate charged by the dealer "for like service to nonwarranty customers, provided that the rate charged to nonwarranty customers is reasonable."  Id.  Under this longstanding regime, the primary factor in determining

2

"reasonable compensation" was "the prevailing wage rates being paid by dealers in the community in which the dealer is doing business." Id.

    B.    <u>2009 Amendments</u>

The 2009 amendments to the CFA at issue (collectively, the "2009 Amendments") consist two changes to the prior regulatory scheme, one revising the statutory methods for determining reasonable compensation (the "Reimbursement Provisions"), the other prohibiting manufacturers from recovering from in-state dealers the costs incurred as a result of the Reimbursement Provisions (the "Recoupment Bar").

Rather than requiring the manufacturer to provide the dealer with a schedule of compensation, the Reimbursement Provisions call for "fair and reasonable" compensation to be determined according to specific statutory methods. <u>See</u> Conn. Gen. Stat. § 42-133s(a).  For parts, the average percentage markup is declared by the dealer and

> established by the dealer submitting to the manufacturer or distributor one hundred sequential nonwarranty customer-paid service repair orders which contain warranty-like parts, or sixty consecutive days of nonwarranty customer-paid service repair orders which contain warranty-like parts, whichever is less, covering repairs made no more than one hundred eighty days before the submission and declaring the average percentage markup.

<u>Id.</u> § 42-133s(b).  For labor, the average labor rate is "established by submitting to the manufacturer or distributor all nonwarranty customer-paid service repair orders covering repairs made during the month prior to the submission and dividing the amount of the dealer's total labor sales by the number of total labor hours that generated those sales." <u>Id.</u> § 42-133s(c).  For both parts and labor, certain types of nonwarranty repairs, such as "specials or promotional discounts for retail customer repairs," are excluded in calculating the retail rates customarily charged by the dealer.  <u>Id.</u> § 42-133s(d).

3

Absent objection, parts and labor are to be compensated according to these rates, which are presumed to be fair and reasonable.  See id. §§ 42-133s(b)-(c).  That presumption, however, is rebuttable.  Id.  In particular, within thirty days of the dealer's submissions to the manufacturer, the manufacturer may rebut the dealer's declared rates "by reasonably substantiating" that they are "unfair and unreasonable in light of the practices of all other franchised motor vehicle dealers in the vicinity offering the same line-make vehicles."  Id.  If a declared rate is rebutted, the manufacturer shall propose an adjustment.  Id.  Should the dealer, in turn, disagree with the proposed adjusted rate, the dealer may file a protest with the Commissioner within thirty days of receiving the manufacturer's proposal, in which case the Commissioner will hold a hearing.  Id.  At such a hearing, the burden is on the manufacturer to prove that the rate declared by the dealer is unfair and unreasonable and that the manufacturer's proposed adjustment is fair and reasonable.  Id.

The Recoupment Bar prohibits a manufacturer from otherwise recovering from in-state dealers increased costs due to the Reimbursement Provisions.  In particular, a manufacturer is barred from recovering such costs in the form of

> an increase in the wholesale price of a vehicle or surcharge imposed on a dealer solely intended to recover the cost of reimbursing a dealer for parts and labor pursuant to this section, provided a manufacturer or distributor shall not be prohibited from increasing prices for vehicles or parts in the normal course of business.

Id. §42-133s(g).

C.      Alleged Injury to Members

Alliance's Members have written dealer sales and service agreements ("Dealer Agreements") with Connecticut dealers; with few exceptions, Dealer Agreements predate the 2009 Amendments.  Compl. ¶ 16.  Alliance alleges that the Reimbursement

Provisions require Members to pay far more for warranty repairs than provided for in Dealer Agreements, and that the Recoupment Bar prevents manufacturers from exercising their contractual rights to recapture the increased costs. Compl. ¶ 2. Alliance also alleges that the 2009 Amendments were enacted as protectionist legislation at the behest of in-state dealers, who allegedly benefit at the expense of out-of-state manufacturers and dealers as well as at the expense of consumers both in state and out of state. Id. ¶¶ 3-4. Members are alleged to have suffered adverse consequences to their commercial activities as a result of numerous requests from in-state dealers for additional reimbursement. Id. ¶¶ 6, 31. Alliance further alleges that the Reimbursement Provisions and Recoupment Bar raise consumer costs for vehicles and related repairs and products, insulate dealers from competition with independent repair shops, and reward dishonest and inefficient dealers. Id. ¶¶ 7, 32.

## III.   STANDARD OF REVIEW

### A.   Subject Matter Jurisdiction

A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) if the district court lacks the statutory or constitutional power to adjudicate the case. Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir.2008). Although the court takes all facts alleged in the complaint as true, subject matter jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting jurisdiction. Id. Hence, on a Rule 12(b)(1) motion, unlike a Rule 12(b)(6) motion, the plaintiff bears the burden of proving by a preponderance of the evidence that jurisdiction exists. Id. (citing Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)).

5

B.    Failure to State a Claim

A case is properly dismissed under Rule 12(b)(6) if the Complaint fails to allege facts sufficient "to state a claim for relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  As articulated by the Supreme Court in Iqbal and Twombly, the standard for dismissal on a 12(b)(6) motion reflects two working principles.  See Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 717 (2d Cir. 2013).  First, the court's customary acceptance of all allegations in a complaint does not apply to legal conclusions.  See Iqbal, 556 U.S. at 678.  Hence, to survive a motion to dismiss, the Complaint must provide more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  Id.  Second, assuming the truth of all well-pleaded factual allegations, and drawing all reasonable inferences in the plaintiff's favor, the district court must determine whether these allegations and inferences plausibly entitle the plaintiff to relief—that is, whether the complaint shows "more than a sheer possibility that a defendant has acted unlawfully."  Id.  This second task is context-specific and "requires the reviewing court to draw on its judicial experience and common sense."  Id. at 679.

IV.    **DISCUSSION**

Alliance's four-count Complaint challenges the constitutionality of the 2009 Amendments both on their face and as applied.  Compl. ¶ 1.  Counts One and Two allege, respectively, that the Reimbursement Provisions violate the Contracts,

Commerce, and Due Process Clauses of the U.S. Constitution, id. ¶¶ 51-56, and that the Recoupment Bar violates the Commerce and Contracts Clauses, id. ¶¶ 57-59.  In Count Three, Alliance seeks a declaration that, under Connecticut law, measures adopted by Members in response to the economic burden imposed by the Reimbursement Provisions do not run afoul of the Recoupment Bar unless they seek to recover specific, identifiable costs.  Id. ¶¶ 60-64.  Count Four alleges that the Reimbursement Provisions and the Recoupment Bar deprive Members of constitutional rights under color of state law in violation of 42 U.S.C. § 1983.  Id. ¶¶ 65-66.

The Commissioner moves the court to dismiss the Complaint on several grounds.  With respect to Counts One and Two, the Commissioner argues: (1) Alliance lacks standing to challenge the Recoupment Bar; (2) the constitutional claims are not ripe for adjudication; (3) the court should apply Pullman or Burford abstention; and (4) Alliance has failed to state plausible claims for relief.  With respect to Counts Three and Four, the Commissioner argues that, conditional upon the court's dismissal of Counts One and Two, the court should also dismiss Alliance's section 1983 claim, which is derivative of the claims in those other two counts, and should decline to exercise supplemental jurisdiction over the remaining state law claim in Count Three.

Where, as in the instant case, a motion to dismiss is made on the ground that the court lacks subject matter jurisdiction as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first, since lack of subject matter jurisdiction may render the other challenges moot. See Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir.1990); 5B Charles Alan Wright et al., Federal Practice and Procedure § 1350 (3d ed. 2013) ("[W]hen the motion [to dismiss] is based on more

than one ground, the cases are legion stating that the district court should consider the Rule 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined by the judge."). Standing and ripeness implicate the court's jurisdiction. The court, therefore, considers these issues at the outset—along with the discretionary doctrines of abstention—before addressing whether Alliance has stated plausible claims for relief under Rule 12(b)(6).

The court holds as follows: (1) with respect to Alliance's facial challenge, the threshold criteria of subject matter jurisdiction are met, and abstention is unwarranted; (2) Alliance's purported as-applied challenge is dismissed for lack of supporting allegations that would permit the court to determine standing and ripeness; (3) Counts One and Two are dismissed for failure to state plausible constitutional claims; (4) Count Four, which alleges injury under section 1983 due to the constitutional claims in Counts One and Two, is likewise dismissed; and, (5) in the absence of any remaining federal claims, the court declines to exercise supplemental jurisdiction over Count Three, which seeks declaratory relief concerning the scope of application of the Recoupment Bar under state law.

A.     Standing

A plaintiff association, such as Alliance, has standing "to bring suit in its own name on behalf of its members if: '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc., 448 F.3d 138, 144 (2d

Cir. 2006) (quoting <u>Hunt v. Washington State Apple Adver. Comm'n</u>, 432 U.S. 333, 343 (1977)).  Under the first prong of the analysis, an individual member of the plaintiff association has standing to sue if:  "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  <u>Id.</u> (quoting <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180-81 (2000) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S 555, 560-61 (1992))).  "The injury-in-fact necessary for standing need not be large, an identifiable trifle will suffice."  <u>LaFleur v. Whitman</u>, 300 F.3d 256, 270 (2d Cir. 2002) (citation and internal quotation marks omitted).  However, vague intentions to engage in prohibited activity "someday"—without any description of concrete plans—do not support a finding of "actual or imminent" injury.  <u>See</u> <u>Lujan</u>, 504 U.S. at 564.

In the Complaint, Alliance alleges that the 2009 Amendments have inflicted significant economic harm on Members, exposing them to civil liability for exercising contractual rights, and causing them to incur higher costs from doing business in Connecticut by generating numerous requests from in-state dealers for additional reimbursement payments.  Compl. ¶¶ 6, 31.  There is no question that this pecuniary injury suffices to support Alliance's standing in general as an association representing Members' interests.  The question is only whether this pecuniary injury also suffices to support Alliance's standing to bring the particular claims asserted here.  The court concludes that it does.

While the Commissioner does not contest Alliance's standing to challenge the Reimbursement Provisions on the basis of the alleged economic harm to Members, the Commissioner argues that that basis does not support Alliance's standing to challenge the Recoupment Bar.  See Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Mem.") (Doc. No. 32-1) at 17-18.  In particular, Alliance is said to lack standing because its Members do not meet the "injury in fact" prerequisite of individual standing.  Id.  The Complaint alleges only that, absent the Recoupment Bar, Members would "consider" imposing surcharges or modifying benefit programs.  Compl. ¶¶ 40-41, 61-62 (emphasis added).  According to the Commissioner, these allegations do not amount to "concrete plans," as required by Lujan.  See Def.'s Mem. at 18.

The pecuniary injury to Members, however, has two interrelated parts: (1) the higher costs; and (2) the inability to recover those costs.  As alleged in the Complaint, Members would not necessarily bear the costs but for the Recoupment Bar, which prohibits intentionally recovering these increased costs by various contractual means. Id. ¶ 2.  The fact that Members sustain the alleged economic harm because they are unable to adopt previously lawful measures for recovering such costs suffices to support Alliance's standing to pursue its constitutional claims with respect to the Recoupment Bar.  Hence, independently of whether the Complaint states plausible claims for relief, the Complaint adequately alleges an "injury in fact" sufficient to satisfy the threshold requirements of standing to bring these claims.  It would be strange, to say the least, to permit Alliance to challenge the Reimbursement Provisions, but not the Recoupment Bar, based on the alleged pecuniary injury to Members, when that injury is itself alleged to result from the different components of the law working in tandem.

B.    <u>Ripeness</u>

Ripeness is not one doctrine, but two, "constitutional ripeness" and "prudential ripeness," which entail distinct inquiries.  <u>Simmonds v. I.N.S.</u>, 326 F.3d 351, 356-59 (2d Cir. 2003); <u>see</u> <u>also</u> <u>Nat'l Park Hospitality Ass'n v. Dep't of Interior</u>, 538 U.S. 803, 808 (2003) ("The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." (citations and internal quotation marks omitted)).  In the present Motion, the Commissioner argues that Counts One and Two should be dismissed because Alliance's claims are neither constitutionally nor prudentially ripe for adjudication.  <u>See</u> Def.'s Mem. at 9-14.  Only the absence of constitutional ripeness implicates the court's jurisdiction.  <u>Simmonds</u>, 326 F.3d at 357. The court, therefore, addresses that issue first.

1.    Constitutional Ripeness

Like standing, constitutional ripeness is a limit on the power of the judiciary rooted in the Case or Controversy Clause of Article III.  <u>Id.</u> at 357.  "It prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it."  <u>Id.</u>  Constitutional ripeness overlaps with standing, insofar as a case is premature for review if the plaintiff's injury is merely speculative and may never occur, depending on some final administrative resolution.  <u>See</u> <u>New York Civil Liberties Union v. Grandeau</u>, 528 F.3d 122, 130 n.8 (2d Cir. 2008) ("Standing and ripeness are closely related doctrines that overlap most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical." (citation, alteration, and internal quotation marks omitted)); <u>Nat'l Org. for Marriage, Inc. v. Walsh</u>, 714 F.3d 682, 688 (2d Cir. 2013)

("Often, the best way to think of constitutional ripeness is as a specific application of the actual injury aspect of Article III standing.")

Having concluded that Alliance has standing to bring the claims asserted in this action, the court has no trouble determining that Alliance's claims are also constitutionally ripe.  Alliance has alleged not future or speculative harm, but present harm to Members resulting from the challenged provisions of state law.  See, e.g., Compl. ¶¶ 2, 6, 31.

The Commissioner's arguments to the contrary go to the merits of Alliance's claims, and not to the absence of a case or controversy.  Alliance's allegation that, to comply with state law, Members must bear higher costs and refrain from exercising previously lawful means of recovering these costs squarely presents "a real, substantial controversy, not a mere hypothetical question."  AMSAT Cable Ltd. v. Cablevision of Conn., 6 F.3d 867, 872 (2d Cir.1993) (citation and internal quotation marks omitted).  There is, moreover, no uncertainty that the declaratory relief sought would redress the alleged injury.  Hence, regardless of whether the Complaint states plausible claims for relief under Rule 12(b)(6), the claims satisfy the ripeness required by Article III.

2.     Prudential Ripeness

The real issue of ripeness raised by the Commissioner is one of prudential ripeness—that is, not whether Alliance has adequately alleged a case or controversy, but whether the existing controversy will be more definitely presented for sound judgment by the court at a future date.  Simmonds, 326 F.3d at 357.  Akin to discretionary doctrines of abstention, like the Pullman and Burford doctrines, prudential ripeness "constitutes an important exception to the usual rule that where jurisdiction exists a federal court must exercise it."  Id.  In determining whether a dispute is

prudentially ripe, the court must consider a variety of factors, including the likelihood that a plaintiff will be made worse off on account of the delay. Id.

Where a plaintiff challenges a state's regulatory scheme, courts typically engage in a two-step ripeness inquiry, evaluating:  (1) the fitness of the issues for judicial decision; and (2) the hardship to the parties that would result from withholding judicial resolution.  See New York Civil Liberties Union v. Grandeau, 528 F.3d 122, 132 (2d Cir. 2008) (citing Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)).  Issues are "fit for judicial decision" when "they would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now."  Simmonds, 326 F.3d at 359 (citing Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 479 (2001)).  In assessing possible hardship to the parties from withholding judicial resolution, courts ask "whether the challenged action creates a direct and immediate dilemma for the parties." Id. at 360 (citation and internal quotation marks omitted).

The lynchpin of Alliance's Complaint is that dealers' retail rates, which are presumed to be fair and reasonable under the Reimbursement Provisions, see Conn. Gen. Stat. §§ 42-133s(b)-(c), exceed the rates for warranty repairs set out in Dealer Agreements, because the latter rates reflect discounts for volume, predictability, and other benefits to dealers from providing warranty repairs, see Compl. ¶ 30.  Alliance claims, inter alia, that the Reimbursement Provisions require warranty rates to be set at or above dealers' retail rates, id., and that, as a result, Members have received numerous requests for additional reimbursement from in-state dealers and incurred substantially higher costs from doing business in Connecticut, id. ¶ 31.

The Commissioner counters that the Reimbursement Provisions do not <u>require</u> reimbursement at above-contract rates. <u>See</u> Def.'s Mem. at 10-11. On the Commissioner's reading of the statute, a manufacturer need pay above-contract rates only if the manufacturer fails to reach a negotiated resolution with a given dealer and receives an adverse determination from the Commissioner interpreting the "fair and reasonable" standard to dictate the higher rates. <u>See id.</u> at 11. As attested by the Division Manager of Administrative Hearings for the Department of Motor Vehicles, none of this has yet happened. <u>See</u> Payne Aff. (Doc. No. 32-2) ¶¶ 3-4. Only one protest has been filed, and it was withdrawn after the parties resolved the matter on their own. <u>Id.</u> ¶ 3.

a.    <u>Fitness for Judicial Resolution</u>

Alliance challenges the 2009 Amendments both on their face and as applied. <u>See</u> Compl. ¶ 1. A pre-enforcement challenge to the facial validity of a law is normally fit for judicial review as of the law's enactment, because such challenges involve purely legal questions requiring no special agency expertise. <u>See</u> <u>Nutritional Health Alliance v. Shalala</u>, 144 F.3d 220, 227 (2d Cir. 1998); <u>see also</u> <u>Suitum v. Tahoe Reg'l Planning Agency</u>, 520 U.S. 725, 736 n.10 (1997); <u>United States v. Quinones</u>, 313 F.3d 49, 59 (2d Cir. 2002). In contrast, as-applied challenges may well benefit from further development of the factual context in administrative proceedings. <u>See, e.g.</u>, <u>Pennell v. City of San Jose</u>, 485 U.S. 1, 10 (1988).

i.    <u>Fitness of Alliance's As-Applied Challenge for Review.</u> Notwithstanding the Complaint's reference to an as-applied challenge, and plaintiff's counsel's claim of such at oral argument, no as-applied challenge is properly before the court because Alliance has yet to plead facts supporting such a challenge. For standing and constitutional

ripeness purposes, the Complaint adequately alleges an injury-in-fact resulting from the law's present effects on Members' commercial activities.  See Sections IV.A & IV.B, supra. However, Alliance does not allege any unconstitutional application of the law apart from the general applicability of the law to all manufacturers who transact business with in-state dealers.

The as-applied challenge is, therefore, effectively a facial challenge.  As Alliance observes, the distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint."  See Pl.'s Opp'n at 27 n.3 (quoting Citizens United v. F.E.C., 558 U.S. 310, 331 (2010)). Here, however, unlike in Citizens United, there is no narrower, as-applied challenge framed for the court's review.  Given the allegations in Alliance's Complaint, declaring the 2009 Amendments unconstitutional as applied to Members is indistinguishable from declaring the 2009 Amendments facially invalid as a state regulation of the dealer-manufacturer relationship.

It bears emphasizing that, although, in the court's view, no as-applied challenge is present in the instant case, a well-pleaded, narrower as-applied challenge may well pose prudential ripeness concerns.  Absent any action by the Commissioner, the court cannot discern what as-applied challenges may exist.  Indeed, while Alliance or its Members may wish to challenge particular applications of the CFA, with respect to some of these challenges, action by the Commissioner may well be necessary to facilitate sound judgment by this court.  Moreover, Alliance has associational standing to bring only challenges that require no Member to participate individually in the litigation. See Bldg. & Const. Trades Council, 448 F.3d at 144 (citations omitted).

In the absence of pleadings supporting an as-applied challenge, the court cannot assess the need for individual Members to participate in the lawsuit or the prudence of delay to permit development of the issues in administrative proceedings.  Hence, to the extent that Alliance purports to bring a separate as-applied challenge, that challenge is hereby dismissed, because it has not been sufficiently pleaded to permit the court to make the requisite threshold determinations of standing and ripeness.

ii.   Fitness of Alliance's Facial Challenge for Review.  A pre-enforcement facial challenge to a law is generally fit for review as of the law's enactment.  See Suitum, 520 U.S. at 736 n.10; Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 170-72 (1967).  The Commissioner argues, however, that the issues presented would benefit from allowing her the opportunity to interpret and apply the challenged provisions "on a case-by-case basis."  See id. at 12.  The court disagrees.  The statute affords the Commissioner a limited role in resolving rate disputes.  Because the issues in this case are neither contingent on, nor likely to be sharpened by, recourse to the Commissioner, they are fit for this court's review.

In determining whether Alliance's facial challenge is fit for review, the court preliminarily construes the challenged provisions of state law.  In so doing, the court is guided by several well-settled precepts of statutory construction in Connecticut.[1]  See, e.g., Republican Party of Connecticut v. Merrill, 307 Conn. 470, 488-89 (2012).  The fundamental objective of the court's statutory construction is "to ascertain and give

---

[1] Federal courts should exercise caution in interpreting state statutes.  See Collette v. St. Luke's Roosevelt Hosp., 132 F. Supp. 2d 256, 267 (S.D.N.Y. 2001).  A federal court may look, in particular, to the state's approach to statutory construction where such an approach is relevant in predicting how the state would construe its own statutes.  See Beason v. United Technologies Corp., 337 F.3d 271, 275-76 (2d Cir. 2003).  Here, as in Beason, the Connecticut Supreme Court has not directly addressed the issues before this court, but that Court's precedent on statutory construction provides direction.  Id.

effect to the apparent intent of the legislature." Id. Under the "plain meaning rule" of section 1-2z of the Connecticut General Statutes,

> [t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.

Conn. Gen. Stat. § 1-2z. Only if "examination of the text of the applicable statute and related statutes yields an ambiguity" will the court "resort to extratextual sources, such as the legislative history and circumstances surrounding the statute's enactment." Cordero v. Univ. of Connecticut Health Ctr., 308 Conn. 215, 225 (2013). "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." Bennett v. New Milford Hosp., Inc., 300 Conn. 1, 11 (2011).

As amended in 2009, the CFA sets out, inter alia, procedures for determining "fair and reasonable" reimbursement for warranty services and for resolving rate disputes between manufacturers and dealers. See Conn. Gen. Stat. §§ 42-133s. Under subsections (b) and (c), the respective warranty rates for parts and labor are declared by a dealer based on the rates charged by the dealer for similar nonwarranty services during the period immediately preceding the dealer's submissions to the manufacturer. Id. §§ 42-133s(b) & (c). Although the dealer's declared rates are presumed to be "fair and reasonable," a manufacturer may rebut that presumption and propose a modified rate. Id. A dealer who disagrees with the proposed modification may then file a protest with the Commissioner, who will hold a hearing pursuant to the statute, at which hearing the manufacturer bears the burden of proof. Id.

17

According to the Commissioner, the issues here are unfit for review because, in the absence of protests, the Commissioner has yet to interpret and apply the "fair and reasonable" standard.  See Def.'s Mem. at 12-13.  The Reimbursement Provisions, however, prescribe one method by which manufacturers may, in the first instance, rebut the statutory presumption supporting a dealer's proposed rate—namely, "by reasonably substantiating that the rate is unfair and unreasonable in light of the practices of all other franchised motor vehicle dealers in the vicinity offering the same line-make vehicles."  Conn. Gen. Stat. §§ 42-133s(b) & (c).  A proposed modification by the manufacturer is to be "based on [this] rebuttal."  Id.  Moreover, in any subsequent administrative proceeding, the manufacturer bears "the burden of proving that the rate declared by the dealer was unfair and unreasonable as described in this subsection and that the proposed adjustment . . . is fair and reasonable pursuant to the provisions of this subsection."  Id. (emphasis added).  The phrases limiting the manner in which the manufacturer may carry its burden of proof indicate the legislature's clear intent to bar extra-statutory grounds for disputing dealer's proposed rates.

The Commissioner contends that the phrase "in light of" leaves open her consideration of other unenumerated factors.  This construction ignores the plain meaning of the statutory language in context and is inconsistent with the intent of the legislature, as embodied in the text of these and related provisions of the CFA.

First, the phrase "in light of" is used in context to specify how a manufacturer may rebut the dealer's proposed rates:  if the manufacturer so chooses, it may reasonably substantiate that the dealer's rates are "unfair and unreasonable in light of the practices" of vicinity dealers.  Id.  The phrase "in light of"—which bears its ordinary sense of "in

18

consideration of" or "in relationship to," <u>Webster's II New College Dictionary</u> 634 (1995),
or "in view of," <u>Webster's Third New International Dictionary</u>, 1308 (1981), <u>see</u> <u>also</u>
<u>Oxford English Dictionary</u>, www.oed.com ("with the help afforded by knowledge of
(some fact)")—precedes the single explicit statutory basis of rebuttal.  The legislature
could have provided other associated grounds of rebuttal like cost or profit margins, but
it chose not to do so.  Under the doctrine of <u>expressio unius est exclusio alterius</u>, the
court infers that such connected, but unmentioned grounds of rebuttal were excluded.
<u>See</u> <u>State v. Bell</u>, 303 Conn. 246, 265 (2011); 2A Norman J. Singer & J.D. Shambie
Singer, <u>Sutherland Statutory Construction</u> § 47:23 (7th ed. 2012).  Indeed, subsections
(b) and (c), in which the phrase appears, expressly limit the manufacturer to the
description of "fair and reasonable" provided in those subsections.  <u>Id.</u>  Hence, on the
court's reading of the plain language of the statute, there is no legal basis for the
manufacturer to argue about cost or profit margins either to the dealer, in response to
the dealer's declared rates, or to the Commissioner, in "any hearing held pursuant to"
subsections (b) and (c).  <u>Id.</u>

 As evident in the text of these and related provisions, the legislature's intent was
to increase warranty reimbursement payments to dealers by using dealers' retail rates,
whether the retail rates are those declared by a given dealer or those of all vicinity
dealers.  <u>Id.</u>  In fact, subsection (d) excludes a variety of low-cost or discounted
nonwarranty repairs from the calculation of the dealer's declared rates.  <u>Id.</u> § 42-
133s(d).  Similarly, subsection (e) requires manufacturers to reimburse dealers for parts
at the statutory rate—based on average percentage markup—even for parts provided
by the manufacturer at no cost to the dealer.  <u>Id.</u> § 42-133s(e).  Subsection (g)—also

known as the Recoupment Bar—expressly prohibits manufacturers from intentionally recovering costs from Connecticut dealers.  Id. § 42-133(f).  Together, these sections demonstrate that the legislature not only intended to use dealers' retail rates as the basis for warranty reimbursement, but also plainly contemplated that, in maximizing reimbursement to dealers, higher costs would be borne by manufacturers.

Finally, it bears emphasizing that the administrative hearing is a statutory remedy afforded to the dealer, not the manufacturer.  Under subsections (b) and (c), the manufacturer is entitled to rebut the statutory presumption supporting the dealer's declared rates by substantiating that those rates are unfair in light of the practices of vicinity dealers and to propose a modified rate on that basis.  Id. §§ 42-133s(b) & (c).  However, only the dealer has the right to institute proceedings before the Commissioner by filing a protest, even though the manufacturer ultimately bears the burden of proof in such proceedings.  Id.

Given the absence of non-statutory grounds of rebuttal, Alliance's claims here are not contingent on, nor are they likely to be obviated by, factual development or agency interpretation in administrative proceedings.   Alliance's claims are premised only on the alleged disparity between rates in preexisting Dealer Agreements and dealers' nonwarranty rates in general.  See Compl. ¶ 2.  The claims have nothing to do with discrepancies between a particular dealer's rates and those of vicinity dealers. What Alliance challenges, then, is not something committed to the Commissioner's discretion under section 42-133s, but something dictated by the legislature—that is, the use of dealers' retail rates (or the "practices" of all other motor vehicle dealers in the vicinity) as the statutory basis for determining compensation for warranty repairs.  The

use of those rates reflects a legislative judgment that nonwarranty rates are fair and reasonable.  The fact that the Commissioner is empowered to resolve some disputes does not empower her to alter this legislative judgment.  Hence, requiring Alliance to await the Commissioner's case-by-case elaboration of the "fair and reasonable" standard will not refine for the court's review the constitutional injury alleged in this case and for which Alliance seeks judicial relief.

Alliance's challenge to the facial validity of the 2009 Amendments is, therefore, fit for review.  Of course, to succeed on this challenge, Alliance must prove that <u>no</u> set of circumstances exist under which the challenged provisions would be valid.  <u>See</u> <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987).  Facial challenges to legislative enactments are, for that very reason, the most difficult type of challenge to mount successfully.  <u>Id.</u>

b.      <u>Possible Hardship to Members</u>

As the Commissioner points out, the Reimbursement Provisions do not penalize Members who seek to rebut a dealer's proposed rates.  <u>See</u> Def.'s Mem. at 13.  The hardship to Members from delaying judicial resolution comes from other sources.  In particular, Alliance alleges that Members have incurred significantly higher costs of doing business in Connecticut and have foregone options for mitigating these costs as a result of the 2009 Amendments.  <u>See</u> Compl. ¶¶ 2, 6, 31, 35-37.

In assessing possible hardship, courts ask whether the challenged provisions create "a direct and immediate dilemma for the parties."  <u>Grandeau</u>, 528 F.3d at 134 (quoting <u>Marchi v. Bd. of Coop. Educ. Servs. of Albany</u>, 173 F.3d 469, 478 (2d Cir. 1999)).  Based on the allegations in the Complaint, Members must choose whether to comply with the law, reimbursing dealers at allegedly above-contract rates, <u>see</u> Compl.

¶ 2, or to violate the law, risking civil liability, see Conn. Gen. Stat. § 42-133ee (authorizing damages actions for CFA violations).  Given the likelihood of continuing hardship to Members, and the fitness of Alliance's claims for review, delaying judicial review is unwarranted.

Having determined that Alliance's facial challenge is both constitutionally and prudentially ripe, the court addresses the propriety of applying either Pullman or Burford abstention to this case.

C.    Abstention

Abstention doctrines are "extraordinary and narrow exceptions to a federal court's duty to exercise its jurisdiction."  Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d 84, 100 (2d Cir. 2012) (citing Woodford v. Cmty. Action Agency of Greene Cnty., Inc., 239 F.3d 517, 522 (2d Cir. 2001)) (internal quotation marks omitted).  Based on much the same analysis as in Section IV.B.2, supra, the court concludes that abstention is not justified and would lead to needless delay.

1.    Pullman

Pullman abstention stems from the concern that "a federal court will be forced to interpret state law without the benefit of state-court consideration and therefore under circumstances where a constitutional determination is predicated on a reading of the statute that is not binding on state courts and may be discredited at any time—thus essentially rendering the federal-court decision advisory and the litigation underlying it meaningless."  Moore v. Sims, 442 U.S. 415, 428 (1979).  "Abstention under the Pullman doctrine may be appropriate when three conditions are met:  (1) an unclear state statute is at issue; (2) resolution of the federal constitutional issue depends on the

interpretation of the state law; and (3) the law is susceptible to an interpretation by a state court that would avoid or modify the federal constitutional issue." <u>Vermont Right to Life Comm., Inc. v. Sorrell</u>, 221 F.3d 376, 385 (2d Cir. 2000) (citation and internal quotation marks omitted).

However, the doctrine is one of discretion. "Satisfaction of all three criteria does not automatically require abstention." <u>Id.</u> Indeed, "important federal rights can outweigh the interests underlying the <u>Pullman</u> doctrine." <u>Id.</u> (citation, alterations, and internal quotation marks omitted). In applying <u>Pullman</u> abstention, courts must bear in mind that the balance is to be "heavily weighted in favor of the exercise of jurisdiction." <u>Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.</u>, 460 U.S. 1, 2 (1983).

In the present case, Alliance alleges violations of federal constitutional rights. The Commissioner argues that abstention is warranted because of the uncertainty as to how the Commissioner will interpret and apply the "fair and reasonable" standard under state law. The court disagrees. Regardless of the merits of Alliance's claims, a plaintiff's decision to bring suit in federal court to vindicate federal rights, over which this court has clear jurisdiction, is not to be disregarded lightly. While terms like "fair" and "reasonable" may be "inherently <u>flexible</u>," Def.'s Mem. at 15, these terms are not inherently ambiguous. The Connecticut legislature has given the terms a clear meaning in the context of the statutory scheme. <u>See</u> Section IV.B.2.a.ii, <u>supra</u>.

It is true that, in Count Three of the Complaint, Alliance also seeks a declaration that the state's Recoupment Bar only prohibits business decisions which entail the recovery of specific, identifiable costs. The Commissioner argues that Alliance thereby concedes, in effect, that its federal claims hinge on the interpretation of state law or,

alternatively, that Count Three is baseless.  See Def.'s Mem. at 16; Def.'s Reply (Doc. No. 45) at 6.  In the court's view, there is no necessary inconsistency between Alliance's claim that the Recoupment Bar abrogates contractual rights, see Pl.'s Opp'n at 14, and the sought declaration, under state law, that some business decisions are nevertheless not foreclosed, see Compl. ¶ 64.

Admittedly, whether the Recoupment Bar leaves open any contractual means of mitigating the economic harms alleged in this case is a matter of state law.  Confronted with a particular application of the Recoupment Bar, a state court employing the canon of constitutional avoidance may well provide a limiting construction.[2]  Yet such a limiting construction would not avoid Alliance's facial challenge here.

The Recoupment Bar reads:

> A manufacturer or distributor may not otherwise recover its costs from dealers within this state, including an increase in the wholesale price of a vehicle or surcharge imposed on a dealer solely intended to recover the cost of reimbursing a dealer for parts and labor pursuant to this section, provided a manufacturer or distributor shall not be prohibited from increasing prices for vehicles or parts in the normal course of business.

Conn. Gen. Stat. Ann. § 42-133s(g).  Based on the text alone, price increases in the ordinary course of business are permitted.  Many, if not all, otherwise contractually permissible cost-recovery methods—including the surcharges expressly contemplated by Members, see Compl. ¶ 40—are unequivocally prohibited.  Whether the Recoupment Bar makes it unlawful, in addition, for Members to modify benefit or incentive programs on the basis of multiple factors, only one of which is in-state costs from warranty reimbursement payments to dealers, presents a closer question of state

---

[2] Unlike a state court, a federal court may not impose a limiting construction on a state statute unless such a construction is readily apparent.  See Tunick v. Safir, 209 F.3d 67, 76 (2d Cir. 2000).

law.  Yet, however a state court might rule on that question, the instant challenge to the facial validity of the 2009 Amendments will not be avoided.[3]  Even assuming Members were permitted to modify some benefit programs in some circumstances, the issue in the instant case would remain whether the 2009 Amendments—to the extent that they raise costs for manufacturers and bar otherwise lawful means of recovering those costs—are facially constitutional.

While Connecticut courts are the ultimate expositor of the meaning of Connecticut law, and are likewise capable of adjudicating Alliance's claims here, including its federal constitutional claims, Alliance chose to institute suit in this forum. The court will not disturb that choice, absent a determination that the state statute at issue is unclear and susceptible of an interpretation by a state court that would avoid of modify the constitutional issues presented by Alliance's facial challenge.  Having concluded that the state statutory construction will not alter the gravamen of Alliance's facial federal constitutional attack, the court declines to apply <u>Pullman</u> abstention.

       2.    <u>Burford</u>

The aim of <u>Burford</u> abstention is to "avoid resolving difficult state law issues involving important public policies or avoid interfering with state efforts to maintain a coherent policy in an area of comprehensive regulation or administration."  <u>Bethphage Lutheran Serv., Inc. v. Weicker</u>, 965 F.2d 1239, 1243 (2d Cir. 1992) (quoting <u>Am. Disposal Servs., Inc. v. O'Brien</u>, 839 F.2d 84, 87 (2d Cir. 1988)).  Under <u>Burford</u>, a federal court should decline to exercise its equitable jurisdiction to interfere with state

---

[3] Notably, neither party has asked the court in their briefs to certify the question to the Connecticut Supreme Court.  <u>See</u> Conn. Gen. Stat. § 51-199b(d) ("The Supreme Court may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state.").

administrative or judicial proceedings if it determines that:  (1) there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 361 (1989) ("NOPSI"); or (2) federal review in such cases will disrupt "state efforts to establish a coherent policy with respect to a matter of substantial public concern," id.  In applying Burford abstention, courts in this Circuit consider:  (1) the degree of specificity of the state regulatory scheme; (2) the necessity of discretionary interpretation of state statutes; and (3) whether the subject matter of the litigation is traditionally one of state concern.  Weicker, 965 F.2d at 1243.

Undoubtedly, the regulation of automobile manufacturers represents an important, albeit not exclusive, area of state regulation.  However, there are no pending state administrative or judicial proceedings with which this court's decision could interfere.  Moreover, as the court already noted in Section IV.B.2, supra, the 2009 Amendments do not necessitate discretionary interpretation by the Commissioner to be susceptible of federal review.  Indeed, Alliance is attacking not discrete actions by the Commissioner, but the statutory scheme itself, as amended in 2009.  Cf. Tenoco Oil Co., Inc. v. Dep't of Consumer Affairs, 876 F.2d 1013, 1029 n.23 (1st Cir. 1989) ("Burford abstention does not apply . . . when the effect of an entire state regulatory scheme is challenged as unconstitutional."); Hickerson v. City of New York, 932 F. Supp. 550, 557 (S.D.N.Y. 1996).  Although the longstanding CFA as a whole is not before the court, the 2009 Amendments set forth a specific policy with respect to warranty reimbursement rates, the details of which have already been formulated.

"Burford is concerned with protecting complex state administrative processes from undue federal interference."  NOPSI, 491 U.S. at 362.  Candidates for Burford abstention typically are cases in which the state has delegated oversight of a scheme involving both statutes and regulations to a state agency in partnership with state courts.  See, e.g., Berman Enterprises, Inc. v. Jorling, 3 F.3d 602, 608 (2d Cir. 1993); Law Enforcement Ins. Co., Ltd. v. Corcoran, 807 F.2d 38, 43 (2d Cir. 1986) ("The New York courts have long been active partners in the state's regulatory plan.").  Here, the court faces the bare statute.  The parties point to no relevant precedent, administrative decisions, or agency rulemaking with which construction of the statute would necessarily be intertwined.  Under the new law, the Commissioner is authorized to resolve certain disputes.  The state, however, has not delegated to her and/or state courts the task of fleshing out an elaborate regulatory scheme.

In sum, the policy challenged by Alliance has already been formulated to a degree sufficient to permit review of Alliance's claims.  Federal review will not impede the state's ability to formulate a coherent policy in an area of substantial import, such a policy having already been formulated.  Hence, Burford abstention, like Pullman abstention, is unwarranted.

D.    Failure to State a Claim in Counts One and Two

The Commissioner moves the court to dismiss this action, not only on jurisdictional and abstention grounds, but on additional grounds under Rule 12(b)(6).  In particular, the Commissioner argues that Alliance fails to state plausible constitutional claims in Counts One and Two and that the remaining claims either are derivative of these claims or pertain to issues exclusively of state law, over which the court should

decline to exercise supplemental jurisdiction in the absence of any remaining federal claims.

At the motion to dismiss stage, the court bears in mind its restricted focus on the legal sufficiency of the Complaint, taking the factual allegations therein to be true and drawing all reasonable inferences in the plaintiff's favor.  Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009).

        1.      Contract Clause

The U.S. Constitution bars states from passing legislation "impairing the Obligation of Contracts."  U.S. Const art. I, § 10.  Although "facially absolute," the Contract Clause

> does not trump the police power of a state to protect the general welfare of its citizens, a power which is paramount to any rights under contracts between individuals.  Rather, courts must accommodate the Contract Clause with the inherent police power of the state to safeguard the vital interests of its people.

Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 367 (2d Cir. 2006) (citations, alterations, and internal quotation marks omitted).  "To determine if a law trenches impermissibly on contract rights, [courts in this Circuit] pose three questions to be answered in succession:  (1) is the contractual impairment substantial and, if so, (2) does the law serve a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) are the means chosen to accomplish this purpose reasonable and necessary."  Id. at 368.

The allegations in Alliance's Complaint plausibly allege that the 2009 Amendments impair Members' contractual relationships with Connecticut dealers.  The threshold inquiry, however, is whether these allegations plausibly allege substantial

impairment.  Energy Reserves Grp., Inc. v. Kansas Power & Light Co., 459 U.S. 400,

411 (1983).  The court concludes that they do not.

      "The primary consideration in determining whether the impairment is substantial

is the extent to which reasonable expectations under the contract have been disrupted."

Sanitation and Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 993 (2d

Cir.1997).  "Impairment is greatest where the challenged government legislation was

wholly unexpected."  Id.  Where, as here, the industry has been heavily regulated, and

regulation of contracts is therefore foreseeable, a party's ability to prevail on its Contract

Clause challenge is greatly diminished.  Id.; see also Sal Tinnerello & Sons, Inc. v.

Town of Stonington, 141 F.3d 46, 53 (2d Cir. 1998) ("If the plaintiff could anticipate,

expect, or foresee the governmental action at the time of contract execution, the plaintiff

will ordinarily not be able to prevail."); Donohue v. Mangano, 886 F. Supp. 2d 126, 157

(E.D.N.Y. 2012) ("Of controlling importance in the determination of whether a law

violates the contracts clause is the foreseeability of the law when the original contract

was made; for what was foreseeable then will have been taken into account in the

negotiations over the terms of the contract." (citation and internal quotation marks

omitted)).

      At the motion to dismiss stage, the question is not whether Alliance will prevail on

the merits, but whether, under the circumstances of the industry and statutory scheme

at issue, Alliance has alleged facts sufficient to plausibly state a claim for relief.  Even

under this liberal pleading standard, Alliance's Complaint fails because it alleges no

facts which, accepted as true, suggest that the 2009 Amendments were unforeseeable

to Members.  Warranty reimbursement rates have long been governed by provisions of

the CFA similar in kind to the Reimbursement Provisions, if somewhat different in scope and detail.  See Pub. Act 82-445, §§ 2(a) & (b) (effective June 8, 1982).  Hence, despite drawing all inferences in Alliance's favor, the court determines that the Complaint does not plausibly allege substantial impairment.

The pertinent contracts between Members and authorized dealers are embodied in Dealer Agreements, which, with few exceptions, predate the 2009 Amendments. Compl. ¶ 16.[4]   However, Alliance mischaracterizes the pre-2009 CFA as "merely prohibit[ing] manufacturers from failing to 'reasonably' compensate dealers for warranty work."  Pl.'s Opp'n at 26.  On the contrary, since 1982, the CFA has mandated specific measures of warranty reimbursement rates, affirmatively tying these rates to what dealers both charge and pay for nonwarranty work.  See Pub. Act 82-445 § 2(b).  Under the regulatory regime prior to 2009, not only was the primary factor in determining reasonableness "the prevailing wage rates being paid by dealers in the community in which the dealer is doing business," id.; it was also unlawful for a manufacturer to reimburse a dealer for warranty work at an hourly labor rate "less than the rate charged by such dealer for like service to nonwarranty customers, provided that the rate charged to nonwarranty customers is reasonable," id. (emphasis added).[5]

---

[4] When exactly Dealer Agreements were formed is unclear on the face of the Complaint. Because Alliance did not attach any examples of such Dealer Agreements to the Complaint, none are part of the present record before the court.

[5] Because the pre-2009 CFA already tied the minimum hourly labor rate for warranty repairs to dealers' nonwarranty rates, there may well be, as the Commissioner argues, an issue as to whether Dealer Agreements, which Alliance alleges contain rates significantly lower than those now required by the 2009 Amendments, were void for violating prior state law.  See Pl.'s Reply at 8.  However, that issue is not properly before the court.  The present inquiry is a narrow one:  whether Alliance has plausibly alleged "substantial impairment"—meaning, in this case, facts sufficient to suggest that the 2009 Amendments were unforeseeable, given the regulations in effect at the time of contracting.  This inquiry does not require determining whether Dealer Agreements were void, as formed.

The question to which the Complaint provides no answer is:  what reasonable expectation did Members have to be free of this sort of regulation of warranty reimbursement rates, which Connecticut has regulated in some detail for decades?  As Judge Posner explained in a similar Seventh Circuit case, "what was foreseeable [at the time of contracting] will have been taken into account in the negotiations over the terms of the contract."  Chrysler Corp. v. Kolosso Auto Sales, Inc., 148 F.3d 892, 894-95 (7th Cir. 1998).  In other words, the expected costs of foreseeable future regulation are already presumed to be priced into the contracts formed under the prior regulation.  Id. at 895.  Unless the 2009 Amendments were unforeseeable, the reasonable possibility of such changes to the CFA was reflected in the terms of Dealer Agreements; hence, invalidating the law would represent a windfall to Members.  Id.

Standing alone, of course, a history of regulation is an insufficient basis on which to reject a Contract Clause challenge.  Id.  A reading of the plain statutory language, however, demonstrates the clear continuity here between the Reimbursement Provisions and their precursor, which covers the same topic and shares the same overt legislative intent to protect dealers.  The pre-2009 CFA likewise incorporated dealers' nonwarranty rates as a baseline, albeit based on labor rates.  Apart from the specific methods for calculating dealers' rates, the largest differences under the 2009 Amendments are:  (1) the shift to determining reasonableness (where disputed) by reference to vicinity dealers' retail rates, rather than by reference to the wages paid by such dealers; and (2) the addition of the Recoupment Bar.

While these changes to the CFA may adversely affect Members, they are scarcely beyond the foreseeable scope of preceding regulation.  The statutory minimum

for warranty labor reimbursement was already the dealer's retail rate—except in the situation where that rate was unreasonable.  See Pub. Act 82-445, § 2(b) (codified as Conn. Gen. Stat. § 42-133s(b) (1982)).  The 2009 Amendments follow this longstanding statutory default in two interconnected ways:  (1) by elaborating methods for calculating declared retail rates and limiting possible avenues of rebuttal, Conn. Gen. Stat. § 42-133s(b) & (c); and (2) by barring manufacturers from passing reimbursement costs along to Connecticut dealers and consumers, id. § 42-133s(g).  The vast majority of states regulate the price of warranty reimbursement payments to automobile dealers, and over a dozen states have enacted analogous recoupment prohibitions.  See Intervenor's Mem. in Supp. of Def.'s Mot. to Dismiss ("Intervenor's Supp.") (Doc. No. 48) at 8.  In a similar case brought by Alliance in 2003, the First Circuit held, as a matter of law at the summary judgment stage, that Maine's analog of the Recoupment Bar was a "foreseeable addition" to a similar warranty reimbursement scheme.  See Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 42 (1st Cir. 2005).[6]  That Alliance has been engaged in similar litigation for years weighs against the very plausibility of its substantial impairment claim here.

Alliance's sole remaining argument is that foreseeability should be addressed on the basis of a factually developed record.  See Pl.'s Opp'n at 35.  By Alliance's own

---

[6] Alliance relies on another case brought in Florida, in which the district court declined to dismiss the Contract Clause claim.  See Alliance of Auto. Mfrs., Inc. v. Jones, 897 F. Supp. 2d 1241 (N.D. Fla. 2012).  That reliance is misplaced.  In Jones, the defendants argued only that Alliance lacked associational standing to bring the claim because the issue of foreseeability would require Members' participation in the litigation.  In Jones, the court held that Alliance had standing, since whether regulation was foreseeable depends on the extent of prior regulation of the industry, not on individual manufacturers' expectations.  Id. at 1255.

The issue here is whether Alliance has plausibly alleged unforeseeability.  That issue was not before the court in Jones.  Moreover, the conclusion in Jones that foreseeability rests on prior regulation of the industry is entirely consistent with this court's view that Alliance has standing but has not plausibly stated a claim.

account, however, what discovery will reveal is only the exact magnitude of the costs incurred by Members, not whether the 2009 Amendments were foreseeable in light of the law at the time of contracting.  Id.  The allegation that the costs and contractual impairments are "substantial," Compl. ¶¶ 31, 33, 38, 54, 59, does not go beyond a threadbare recital of the elements of a Contract Clause claim.  Whether Alliance can prove that Members' costs of doing business in Connecticut are now higher is irrelevant for purposes of the present Motion to Dismiss.  Taken as true, the allegation of cost in the Complaint is still legally insufficient because it provides no basis on which the court could infer that the 2009 Amendments were unforeseeable.  Unless the changes to the CFA were unforeseeable, any impairment from those changes is not substantial, because the possibility of such changes to preexisting law is presumed to be priced into the contracts.  Kolosso, 148 F.2d at 894-95.

Having determined that Alliance's Complaint does not plausibly allege substantial impairment, the court need not reach whether the 2009 Amendments serve a legitimate public purpose.  Absent allegations supporting an inference of substantial impairment, the Complaint fails to plausibly state a Contract Clause claim.

> 2.    Commerce Clause

From Congress's express authority to regulate interstate commerce, see U.S. Const. art. I, § 8, flows the "negative" or "dormant" implication that the Commerce Clause bars state regulation which "discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." Selevan v. New York Thruway Auth., 584 F.3d 82, 90 (2d Cir. 2009) (quoting Gen. Motors Corp. v. Tracy, 519 U.S. 278, 287 (1997)).  However, states retain power "to make laws governing matters of local concern which nevertheless in some measure

affect interstate commerce or even, to some extent, regulate it." Id. A state statute violates the so-called dormant Commerce Clause "only if it (1) clearly discriminates against interstate commerce in favor of intrastate commerce, (2) imposes a burden on interstate commerce incommensurate with the local benefits secured, or (3) has the practical effect of 'extraterritorial' control of commerce occurring entirely outside the boundaries of the state in question." Id. (citation and internal quotation marks omitted).

> a.     Clear Discrimination and Pike Balancing

A statute that clearly discriminates is "virtually invalid per se" and can survive judicial scrutiny only if the discrimination is "demonstrably justified by a valid factor unrelated to economic protectionism." Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004). Absent clear discrimination, the court applies a lower level of scrutiny known as Pike balancing, under which an apparently evenhanded regulation will be invalidated only if the burdens it imposes on interstate commerce are "clearly excessive in relation to the putative local benefits." Id. at 217 (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)). Where, as here, the statute does not regulate competitors in an interstate market, there is no claim either for clear discrimination or for undue burden under Pike.

Alliance alleges that the 2009 Amendments harm not only its Members, but out-of-state dealers as well. See Compl. ¶¶ 55, 58. Alliance further alleges that the CFA, as amended, is "protectionist" legislation, which burdens out-of-state interests while favoring Connecticut dealers. Id. However, Alliance does not purport to represent out-of-state dealers. Nor has it alleged facts that, taken as true, suggest third-party standing. See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 174 (2d Cir. 2005) (requiring, for such standing, litigant to show, in addition to

"injury in fact" to itself, "close relation" to allegedly injured third party and hindrance to that party's ability to protect its own interests).

Under the dormant Commerce Clause analysis, "any notion of discrimination assumes a comparison of substantially similar entities." Gen. Motors, 519 U.S. at 298. Indeed, "in the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." Id. at 300 (emphasis added); see also Town of Southold v. Town of E. Hampton, 477 F.3d 38, 49 (2d Cir. 2007) ("[L]aws that draw distinctions between entities that are not competitors do not 'discriminate' for purposes of the dormant Commerce Clause."). The CFA regulates only the relationship between dealers and manufacturers, who are not competitors in the same market. Hence, given the lack of competition in the same market, Alliance's Complaint fails to plausibly state a claim of clear discrimination or, in the alternative, of undue burden on interstate commerce under Pike balancing.

In fact, Alliance identifies nothing in the CFA that distinguishes out-of-state and in-state interests or that dictates, either directly or indirectly, favorable treatment of in-state interests. Alliance's analogy to West Lynn Creamery, Inc. v. Healy, 512 U.S. 186 (1994), is wholly disingenuous. Unlike here, in West Lynn Creamery, the state used a tax on all fluid milk sold in the state to expressly subsidize in-state dairy farmers. That none of Alliance's Members maintain their principal place of business in Connecticut or have in-state manufacturing facilities is beside the point. While Members are free to relocate to the state, they would not reap any benefit under the CFA by doing so,

because they are not franchised dealers.  Nor are they, in fact, "substantially similar entities."  Gen. Motors, 519 U.S. at 298.

Alliance's related allegation that the 2009 Amendments are "protectionist" is merely conclusory.  The putative "burden" on interstate commerce depends on the possibility that Members will raise prices or reduce benefit programs elsewhere as a result of the Recoupment Bar, which makes it illegal to recover costs from in-state dealers.  See Compl. ¶¶ 55, 58.  Speculative or merely potential pricing impacts not dictated by the state's regulatory regime are not cognizable under the dormant Commerce Clause.  See Freedom Holdings, 357 F.3d at 220; Jones v. Schneiderman, 11 CIV. 8215 KMW GWG, 2013 WL 5452758, *22-23 (S.D.N.Y. Sept. 30, 2013).  If companies' independent economic decisions were a sufficient basis for claims of discriminatory "effects" or excessive "burden," interstate businesses would always be in a position to nullify state regulation simply by arguing that they will shift regulatory costs to another state.  Moreover, although Members themselves are alleged to have incurred higher costs, see Compl. ¶¶ 6, 31, the fact that an interstate company stands to lose money is not of constitutional significance under the dormant Commerce Clause.  See CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 88 (1987) ("The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce."); Exxon Corp. v. Governor of Md., 437 U.S. 117, 127 (1978) ("[The Commerce Clause] protects the interstate market, not particular interstate firms."); Nat'l Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d 104, 110 (2d Cir. 2001) ("[T]hat manufacturers must bear some of the costs of the Vermont regulation in the form of lower profits does not cause the statute to violate the Commerce Clause.").

In sum, there are no allegations in the Complaint from which the court could reasonably infer that the 2009 Amendments facially discriminate, were enacted for a discriminatory purpose, have discriminatory effects, or even burden interstate commerce.  Alliance has, therefore, failed to plausibly state a dormant Commerce Clause claim under the first two prongs of the analysis.

b.     Extraterritorial Control

In Heely v. Beer Institute, Inc., 491 U.S. 324 (1989), the Supreme Court laid out in detail the third ("extraterritoriality") prong of the dormant Commerce Clause analysis:

> First, the Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State, and, specifically, a State may not adopt legislation that has the practical effect of establishing a scale of prices for use in other states.  Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature.  The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.  Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.  Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State.

Id. at 336-37 (citations and internal quotation marks omitted).

Alliance's Complaint alleges that the CFA, as amended in 2009, has the "practical effect" of burdening out-of-state interests while favoring domestic interests. Compl. ¶¶ 55, 58.  That allegation is legally insufficient to state a claim, however, because the putative "burden" is not dictated by or otherwise within the control of the state but, instead, depends on potential pricing decisions by Members.  See Freedom

37

Holdings, 357 F.3d at 220; Jones, 2013 WL 5452758, *22-23.  Indeed, the 2009 Amendments make no mention of other states.  Unlike in Healy, where the Supreme Court struck down a Connecticut law requiring out-of-state beer distributors to affirm that their prices posted domestically were no higher than those in bordering states, the CFA provisions here do not peg in-state pricing, benefits, or regulation to other jurisdictions.[7]  The Second Circuit has repeatedly rejected similar extraterritoriality challenges to state regulations containing no reference to other states.  See, e.g., Freedom Holdings, 357 F.3d at 221 (New York cigarette contraband statute); Nat'l Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d 104, 110 (2d Cir. 2001) (Vermont labeling requirement).

To correct this obvious deficiency in its Complaint, Alliance now constructs in its Opposition brief a hypothetical in which the Recoupment Bar might be applied to an entirely out-of-state commercial transaction involving an in-state dealer.  See Pl.'s Opp'n at 45.  Such scenarios do not suffice to save a Complaint otherwise lacking plausible allegations of extraterritoriality.  Not only is Article III standing meant to prevent litigation of general disputes of a "someday" character, Lujan, 504 U.S. at 564; Alliance's facial challenge also cannot be sustained on the abstract possibility of a single unconstitutional application of the Recoupment Bar, Salerno, 481 U.S. at 745.

In the court's view, the third inquiry in Healy—namely, how the challenged statute interacts with other states' legitimate regulatory regimes—makes clear the absence of a plausible extraterritoriality claim in Alliance's Complaint.  See 491 U.S. at 336.

---

[7] Alliance's parallel suit in Florida is, once again, distinguishable in this regard.  Unlike the CFA, the Florida law prohibits licensed manufacturers from offering incentive programs outside the state that they do not offer in Florida, unless they can prove to Florida authorities that relevant differences support the decision to treat two designated zones or regions differently.  See Fla. Stat. § 320.64(38).  Such a scheme clearly resembles the Connecticut law invalidated in Healy.  The CFA, however, contains no such provisions, and Alliance makes no allegations plausibly suggesting that the 2009 Amendments either directly refer to or indirectly rely on other states.

Accepting Alliance's allegations as true and drawing all reasonable inferences in its

favor, the court finds no basis for any necessary interaction between the CFA and other

states' laws, much less a necessarily disruptive interaction.  Given Alliance's parallel

litigation elsewhere, the court is aware of similar warranty reimbursement statutes

enacted by other states.  However, nothing in the present Complaint remotely suggests

that the CFA is inconsistent with the legitimate regulatory regimes of other states.

The Complaint is legally insufficient under any of the three prongs of the analysis.

Accordingly, Alliance has failed to plausibly state a dormant Commerce Clause claim.

### 3.     Due Process

Alliance challenges only the Reimbursement Provisions on due process grounds.

See Compl. ¶¶ 52-53, 56.  As Alliance concedes in its Complaint, the 2009

Amendments were premised on "level[ing] the playing field for new car dealers in

dealing with manufacturers and distributors, in order to promote fair competition."

Compl. ¶ 45.  Alliance alleges, however, that the provisions were actually motivated by

a decrease in the volume of warranty repairs, id. ¶ 47; that the legislature deliberately

sought to recapture lost revenue, id. ¶ 48; that the law insulates dealers from

competition with independent service shops, id. ¶ 49; and that a growing body of

literature undercuts "the well-worn rationale that all motor vehicle franchise laws, no

matter how oppressive, overreaching or economically devastating to manufacturers and

consumers, are necessary to protect dealers from 'abuses' by manufacturers or to 'level

the playing field' to equalize the parties' bargaining power," id. ¶ 50.

Economic legislation like that at issue here is reviewed only for arbitrariness or

irrationality.  See In re Chateaugay Corp., 53 F.3d 478, 486 (2d Cir. 1995).  Substantive

due process requires that such legislation merely be "supported by a legitimate

legislative purpose furthered by a rational means." Id. at 486-87.  Rational basis review

is, thus, "a paradigm of judicial restraint."  F.C.C. v. Beach Commc'ns, Inc., 508 U.S.

307, 314 (1993).

Under this deferential standard of review, a plaintiff must overcome the "strong

presumption of rationality that attaches to a statute." Beatie v. City of New York, 123

F.3d 707, 712 (2d Cir. 1997).  A state has no obligation to produce evidence as part of

any judicial fact-finding, because legislative choices that do not single out suspect

groups or burden fundamental rights "may be based on rational speculation

unsupported by evidence or empirical data." Heller v. Doe by Doe, 509 U.S. 312, 320,

(1993).  Hence, to state a due process claim, a plaintiff must set forth sufficient

allegations plausibly showing that the legislative facts relied on "could not reasonably be

conceived to be true by the governmental decisionmaker." Beatie, 123 F.3d at 712.

Even accepting Alliance's allegations as true, the court determines that they are

insufficient to overcome the strong presumption of legislative rationality.  While Alliance

claims that the Reimbursement Provisions harm consumers and go against a growing

tide of research, nothing in the Complaint plausibly suggests that it was irrational or

arbitrary for the state legislature to reach a contrary conclusion.  Whether, in fact, the

law injures consumers or lacks empirical support, see Compl. ¶¶ 46, 50, is irrelevant.[8]

In enacting the 2009 Amendments, the legislature could reasonably have thought to

---

[8] Alliance cites the Supreme Court's decision in Shelby County v. Holder, 133 S. Ct. 2612 (2013), for the proposition that state legislatures may not rely on outdated data, where the conditions that originally justified the law's adoption have changed.  See Pl.'s Response to Intervenor (Doc. No. 50) at 5-6.  In Shelby County, however, the question was whether sufficient data supported extraordinary congressional action impinging on states' sovereignty.  In this case, the question is only whether the state, in passing ordinary economic legislation pursuant to its undisputed police power, has chosen reasonable ends to achieve a legitimate legislative purpose.

help consumers on the view that, if dealers need not subsidize below-market rates for warranty work, they can offer more competitive retail rates.  See Def.'s Mem. at 38.

Alliance argues that the contrary positions of the parties make resolution at the pleadings stage inappropriate.  See Pl.'s Opp'n at 47-48.  However, it is well settled that the Government has no duty to produce evidence to sustain a validly enacted statute's rationality.  Lewis v. Thompson, 252 F.3d 567, 582 (2d Cir. 2001).  Indeed, absent suspect classifications or impingement on fundamental rights, state legislative decisionmaking is not subject to a federal court's factfinding.  Heller, 509 U.S. at 320. In the area of economics or social welfare, legislation need not be effective or even logically consistent, in every respect, with its articulated aims in order to survive federal due process review.  See Williamson v. Lee Optical, 348 U.S. 483, 487-88 (1955).  "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."  Williamson, 348 U.S. at 488.

Unless Alliance alleges facts from which the court may reasonably infer arbitrary or irrational governmental action, the court must defer to the Connecticut state legislature.  Because Alliance's Complaint makes no such factual allegations, it fails to plausibly state a substantive due process claim under the U.S. Constitution.

E.     Dismissal of Counts Three and Four

Based on the dismissal of Counts One and Two, Counts Three and Four of Alliance's Complaint must likewise be dismissed.  Without Counts One and Two, Alliance's section 1983 claim in Count Four lacks plausible allegations of "deprivation[s]" of constitutional rights.  42 U.S.C. § 1983.  In the absence of any remaining federal

claims, the court declines to exercise supplemental jurisdiction over Alliance's claim for declaratory relief under state law in Count Three.  See 28 U.S.C. §§ 1367(c)(3).

## V.    CONCLUSION

For the reasons set forth above, the court **GRANTS** the Commissioner's Motion to Dismiss (Doc. No. 32).  The Clerk is hereby directed to close this case.  If Alliance believes that it can allege facts sufficient under Rule 11 to warrant repleading in light of this Ruling, it has until **December 16, 2013** to move the court to reopen the case with a proposed amended complaint attached.

**SO ORDERED.**

Dated at New Haven, Connecticut this 26th day of November, 2013.


_____/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge